**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**CITY OF NORTHLAKE, ILLINOIS,
Defendant–Appellee.**

No. 90–1822.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1991.

Decided Sept. 6, 1991.

Rehearing Denied Oct. 28, 1991.

Mark A. Flessner, Ira H. Raphaelson, Asst. U.S. Attys., Office of U.S. Atty., Criminal Div., Nancy K. Needles, AUSA Office of U.S. Atty., Civ. Div., Appellate Section, Chicago, Ill., John R. Dunne, David K. Flynn, Miriam R. Eisenstein (argued), Asst. Attys. Gen., Dept. of Justice, Civ. Rights Div., Appellate Section, Washington, D.C., for plaintiff-appellant.

Samuel V.P. Banks, Edward B. Miller (argued), Robert J. Weber, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, WOOD, Jr. and COFFEY, Circuit Judges.

CUMMINGS, Circuit Judge.

In the 1980s, the Civil Rights Division of the Department of Justice filed fourteen lawsuits on behalf of the United States against small Chicago-area communities. The suits challenged a pervasive system of discrimination that left the city payrolls in those cities virtually bereft of any minority employees. Among other things, the United States challenged the requirement that city workers, such as police officers, live within the municipal boundaries of the community for one year prior to notification that the job-entrance examination would be offered. One of these cities was Northlake ("City"), a small Illinois municipality sued by the United States in December 1985 for discriminating against blacks in the recruitment and hiring of municipal employees. The complaint alleged that Northlake failed and refused to recruit or hire blacks on the same basis as whites, and failed and refused to adopt objective, non-discriminatory hiring procedures. Moreover, the complaint specifically challenged Northlake's durational residency requirement, asserting that it was enacted with a racially discriminatory purpose and had an illegal disproportionate impact on blacks. The suit resulted in the entry of a consent decree in March 1987.

In 1990, after the United States had been in repeated contact with the City over its failure to implement the requirements of the consent decree properly, Judge Prentice Marshall denied both the government's motion for further discovery and for a contempt hearing and its subsequent motion to reconsider, concluding that the practices complained of fell outside the scope of the consent decree. He also stated that the evidence presented by the government was inadequate to support a theory of discrimination against racial and ethnic minorities due to the disparate impact of the hiring practices. Because the plain language of the consent decree was undeniably broad and because the district judge seemingly misapprehended the legal theory underlying the government's claim, we reverse and remand in order that the United States may have an opportunity to conduct discovery and present its case for contempt at a hearing.

## I. FACTS

At the time that the United States initiated its lawsuit, the City had no blacks among its sixty-three employees. As grounds for its legal action, the United States relied on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the non-discrimination provisions contained in the now-defunct Revenue Sharing Act of 1972, as amended, 31 U.S.C. § 6716.

Two years later, in March 1987, the United States and the City entered into a judicially approved consent decree. Although the decree did not contain an admission of liability on the part of the City, the agreement mandated a wide range of remedial steps to be taken to ensure that the City would not discriminate against municipal employees in the future. Among other things, the consent decree enjoined the City from engaging in:

> any employment practice which unlawfully discriminates on the basis of race or color in the recruitment or hiring of employees or in other terms and conditions of employment.

Consent Decree of March 30, 1987, App. II at 13. Moreover, in its pledge to avoid any future racial discrimination in hiring, the City assented to the following corrective measures, as set forth in the consent decree:

a. abolishing the durational residency requirement, replacing it with a one year move-in requirement from the date of hire;

b. declining to prefer resident applicants over non-residents for municipal jobs;

c. posting legal notices of job vacancies in two newspapers that circulate outside of the City in communities with large minority populations;

d. abolishing the use of eligibility lists that were drawn up while the durational residency requirement was still in place.

App. II at 13–14. The consent decree sets forth in the remaining eight pages the precise steps to be taken by the City "to adopt and maintain a recruitment program directed at attracting to the City qualified black as well as other minority and white applicants seeking municipal employment opportunities." App. II at 15.

The entry of the consent decree did not yield any immediate results. As of May 1988, fourteen months after Judge Marshall signed the consent decree, the City had yet to attract a single black applicant for a city position, let alone hire any full-time black employees. Therefore, the United States reopened negotiations with the City in order to formulate a program whereby the City would be able to attract black applicants for its July 1988 recruitment efforts for the police department. During these talks, the Justice Department urged the City to publicize the availability of positions to the black community by advertising in the media and soliciting the help of organizations with ties to the black community such as the Urban League. The City ignored these urgings, choosing to advertise in a few regional newspapers and to add a $15 filing fee to police department applications with the goal of discouraging "less serious" applicants. It was not until August 1988, when the United States warned the City that it was not complying with the consent decree, that Northlake finally acted on the United States' recommendations.

By September 1988, the City managed to attract thirty-three additional applications for positions in the police department. Seven of these applicants were black. Following the two rounds of recruitment efforts by the City, a total of sixty-two individuals, including the seven blacks (11.2%), had applied for police positions.

Twelve candidates passed the written and physical agility portions of the police exam and sat for the oral evaluation. These applicants were interviewed by the Board of Fire and Police Commissioners. The four blacks among the final ten who passed the oral exam and were therefore recommended for police positions had proportionately higher scores than the six whites on the written and physical portions of the exam. However, the blacks received significantly lower oral scores, resulting in lower overall scores that put all four blacks in the bottom half of the list. A candidate's position on the list determined the order in which positions were to be filled. Ultimately, because of a shortage in police officers, all of the finalists remaining on the list were offered positions as police officers. One of the black candidates accepted a job.

The United States discovered that the Board members, in conducting the oral interviews, were provided with six interview questions prepared by an outside consultant. The Board members did not receive any other guidelines or criteria. According to Division D, § 2 of the Rules and Regulations governing the operations of the City of Northlake Board of Fire and Police Commissioners, the Board members were required to judge the applicants according to their appearance, voice and speech, alertness, ability to present ideas, judgment, emotional stability, self-confidence, friendliness, and "personal fitness for the position." Affidavit of Timothy Karaskiewicz, January 25, 1990, App. II at 60–61. There was no agreement among the interviewers as to what each of these terms meant. In fact, the Board's Chairman instructed the interviewers before the first interview to "grade the way you feel." App. II at 61.

The subjectivity of the interview process prompted the United States' claim that the City had violated the terms of the consent

decree. On October 23, 1989, the plaintiff filed a motion with Judge Marshall for supplemental relief and an order permitting discovery. In its motion, the government alleged that by use of the subjective interview practices the City had intentionally discriminated on the basis of race in the process of selecting police officers, thereby violating the consent decree. In its request for an order permitting discovery, the United States asked to develop an evidentiary basis to support its allegations of purposeful discrimination.

■ Judge Marshall heard oral argument on the government's motion on January 10, 1990. He denied relief from the bench, concluding that the plaintiff could properly make its claims only by way of a new action. Acknowledging that the consent decree contained broad language, he emphasized that the suit against the City "started out as a residence case," App. I at 5, and that the government in its attempt to initiate a contempt proceeding has attempted to turn the suit into a "testing and selection case." App. I at 7.

Moreover, Judge Marshall did not believe that the government's motion contained evidence sufficient to warrant a hearing. In support of this determination, the district judge pointed to the fact that twenty-two percent of the original applicants were black, while the percentage of blacks among the final ten candidates rose to forty percent. As for the fact that the four black finalists were ranked in the bottom half of the list, he determined that this disparity did not rise to the level of contempt on the part of the City. App. I at 7. On February 8, 1990, he denied the government's motion for reconsideration, again stating that the plaintiff could "proceed by way of a fresh action." App. I at 10. This order prompted the government to appeal.

## II. ANALYSIS

### A. *The Scope of the Consent Decree*

At the oral hearing on the government's application for a contempt hearing, Judge Marshall discussed the breadth of the consent decree as follows:

[BY THE COURT:]

Well, I've reviewed the matter and the case started out as a residence case, and I know that the consent decree has some additional broad language in ·it.

But it started out as a residence case. And now under the mantle, let us say, of a contempt proceeding, it has shifted ground, and it's becoming a testing and selection case.

App. I at 5.

■ Even if the case did initially center on the residency requirement, the proper focus must be on the language contained within the consent decree itself. A judicially approved consent decree, like a settlement agreement, is essentially a contract for purposes of construction. *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 3073, 92 L.Ed.2d 405 (recognizing that consent decrees have a dual character, that of contract and that of judicial decree, subjecting them to different treatment for different purposes); *Kasper v. Board of Election Comm'rs,* 814 F.2d 332, 338 (7th Cir.1987) (identifying the expression of the parties' will as the contractual aspect of a consent decree). Therefore, fundamental principles of contract interpretation under relevant state law apply when a court is presented with the task of interpreting the provisions of a consent decree.

First the enforcing court will look to the plain language of the written agreement as the best expression of the parties' intent. If, as this Court has noted before, "the language of the contract unambiguously provides an answer to the question at hand, the inquiry is over." *Lumpkin v. Envirodyne Indus., Inc.,* 933 F.2d 449, 456 (1991), quoting *La Salle Nat'l Bank v. Service Merchandise Co.,* 827 F.2d 74, 78 (7th Cir. 1987). If the plain language of the writing is unclear, then parol or other extrinsic evidence must be considered in order to reconstruct the intent of the parties at the time they entered into the agreement. *Lumpkin,* 933 F.2d at 456; see, *e.g., United States v. Western Elec. Co.,* 900 F.2d 283, 293 (D.C.Cir.1990) (acknowledging that "while the meaning of the [Consent] De-

cree's terms must be discerned within its four corners, [a court's] inquiry is guided by conventional aids of construction") (citation omitted), certiorari denied, —— U.S. ——, 111 S.Ct. 283, 112 L.Ed.2d 238. (1990).

Abolition of the residency requirement was only one of the remedial steps agreed to by the city to "ensure that the employment policies and practices of the City of Northlake are lawful and nondiscriminatory, and to ensure that blacks are not unlawfully disadvantaged in the recruitment and hiring practices of the City." App. II at 12. The decree devoted exactly one paragraph to the residency requirement, App. II at 13, while the remainder of the writing unambiguously prescribed a host of other corrective measures and procedures, all designed to achieve broadly the goal of fair and non-discriminatory hiring in municipal employment in the City. After mandating the elimination of the residency requirement, the consent decree goes on for an additional nine pages, describing all of the other steps to be taken by the City. These include posting notices in newspapers with substantial minority circulations; desisting from using existing employment eligibility lists, maintaining a recruitment program, and adopting non-discriminatory application and record-keeping procedures. The plain language of the consent decree could not be clearer. The government's challenge to the oral interview procedures used in testing police applicants falls entirely and comfortably within the scope of the consent decree.

Moreover, any belief that the case began as a challenge to the residency requirement is inconsistent with the broad allegations contained in the plaintiff's initial complaint against the City. While it is true that the complaint specifically identified the residency requirement, the complaint also alleged that the defendant discriminated against blacks in both its failure or refusal to adopt objective valid and non-discriminatory municipal hiring procedures, App. II at 7–8, and its failure to adopt and implement a vigorous recruitment program designed to attract qualified blacks for employment by the City. App. II at 9.

There is no basis for concluding that the subjective hiring practices complained of here by the United States fall outside the comprehension of the consent decree. To suggest that the United States may proceed by way of a "fresh" complaint if it desires to litigate this issue, App. I at 5, undermines the purpose of a consent decree in the first instance—namely, to avoid protracted litigation by entering into a court-supervised agreement that resolves the dispute to the satisfaction of all parties concerned and guarantees the viability of the agreement under the watchful eye of the judge whose signature appears at the end of the document. If the defendant violates the terms of the consent decree, the plaintiff's recourse is to bring an action to enforce the decree. See *E.E.O.C. v. Safeway Stores, Inc.*, 714 F.2d 567, 573–574 (5th Cir.1983) (holding that actions to consider or enforce voluntary conciliation agreements between the E.E.O.C. and the defendants under Title VII are properly within the jurisdiction of the federal courts), rehearing denied, 720 F.2d 677, certiorari denied, 467 U.S. 1204, 104 S.Ct. 2384, 81 L.Ed.2d 343; *E.E.O.C. v. Liberty Trucking Co.*, 695 F.2d 1038, 1043–1044 (7th Cir.1982) (noting that consent decrees can be enforced directly in federal court through contempt proceedings and conciliation agreements may also be enforced in federal court even though they are voluntarily entered into without court approval).

To make the United States file a new lawsuit to remedy allegedly illegal conduct already embraced by a consent decree would serve as a disincentive to civil rights plaintiffs contemplating whether or not to enter into such a decree. It would also undermine the congressionally expressed preference for cooperation and voluntary compliance in the resolution of employment discrimination disputes. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147; *Liberty Trucking*, 695 F.2d at 1042–1043; *United States v. Allegheny–Ludlum Indus., Inc.*, 517 F.2d 826, 846–847 (5th Cir.1975), certiorari denied sub nom. *National Org. for Women, Inc. v. United States*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187. Much

of a consent decree's value lies not in the steps to be taken immediately by the defendant to remedy discrimination, but in the promise that the plaintiff in a case like this one can look to the courts to hold the defendant in contempt for ongoing and future violations. Requiring the United States to file a new lawsuit to remedy discrimination already comprehended by the plain language of the consent decree undermines the judiciary's role in overseeing the proper implementation of the decree and unnecessarily delays, frustrates and prejudices the plaintiff in its efforts to obtain enforcement.

### B. *The United States' Theory of Discrimination*

As an alternative ground for refusing to hold a contempt hearing, Judge Marshall stated that the statistical disparities introduced by the government were insufficient to support a discrimination claim under a theory of disparate impact. Were the plaintiff presenting evidence under a disparate impact theory, it would have to show sufficient statistical disparities attributable to a specific discriminatory employment practice. *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 2788, 101 L.Ed.2d 827. The district judge believed that the statistical evidence offered by plaintiff failed to make out a *prima facie* case of *disparate impact.*

However, under the United States' theory, statistics provided only one indication of the intentional discrimination against black job applicants under a theory of *disparate treatment.* In making its motion for further discovery and a contempt hearing, the United States relied on statistics to raise an inference of intentional discrimination as part of its *prima facie* case of disparate treatment premised illegally on race. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–336 & n. 15, 97 S.Ct. 1843, 1854–55 & n. 15, 52 L.Ed.2d 396; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668.

In support of its case of intentional discrimination, the government does not argue that the subjective hiring practices employed by the City are *per se* discriminatory. However, supported by an oft-cited Sixth Circuit decision, plaintiff does contend that the subjective procedures provide a ready mechanism for discrimination. *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.,* 690 F.2d 88, 93 (6th Cir.1982). This is particularly true in cases like this one, in which the subjective evaluations of black candidates are made exclusively by whites. *Miles v. M.N.C. Corp.,* 750 F.2d 867, 871 (11th Cir.1985); cf. *Marimont v. Califano,* 464 F.Supp. 1220, 1225 (D.D.C.1979) (fact that a board composed exclusively of white males rejected woman candidate's promotion on the basis of subjective criteria supported a *prima facie* case of discrimination).

In addition, the United States provided additional support for its *prima facie* case of intentional discrimination. It cites the failure of the City to hire any black employees prior to the initiation of the lawsuit and the City's continued foot-dragging on minority hiring even after entry of the consent decree, such that the government was required to intervene actively in order to remind the City of its obligations under the decree.

The affidavits filed by the Department of Justice employees to accompany their January 29, 1990, motion for reconsideration of the district court's adverse ruling on the government's October 1989 supplemental relief and discovery motion paint a portrait of a City resistant to complying actively with the terms of the consent decree. For instance, Timothy Karaskiewicz, an attorney with the Employment Litigation Section of the Civil Rights Division at the Department of Justice, attested to the fact that the City did not recruit black applicants and failed to advertise for available positions in accordance with the terms of the consent decree. App. II at 54–55. Moreover, Mr. Karaskiewicz reported that a City official explained that Northlake imposed the $15 filing fee to discourage the less serious applicants from applying. App. II at 54. Finally, the Justice Depart-

ment lawyer described in some detail the oral interview procedures used to screen the final ten applicants, and his description makes clear the extent to which the interview process was subjective, loose and dependent on vague overall impressions by the oral examiners in evaluating the applicants. App. II at 56–65.

The subjectivity of the City's procedures during the oral interview process, when combined with the factual record in this case, supports the inference that the City intentionally discriminated against blacks in its efforts to recruit and hire new police officers. The district judge apparently mistook the government's use of statistics in its motion for a contempt hearing as evidence of the disparate impact of the City's employment practices. Instead, the United States endeavored to build a record of disparate treatment and did not desire to hinge its whole case on statistics. The government presented statistics for the important role that they play in cases in which discrimination is a disputed factual issue as they "are often a telltale sign of purposeful discrimination." *Teamsters*, 431 U.S. at 339–340 & n. 20, 97 S.Ct. at 1857 & n. 20; *McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. at 1826; *Miles*, 750 F.2d at 873.

### III. CONCLUSION

As the district judge noted during the hearing in which he denied the government's motion for supplemental relief and discovery, he has had substantial experience with municipal discrimination cases in the City of Chicago and in surrounding communities. When the hearing was held in January 1990, Judge Marshall had been involved for sixteen years with hiring and promotion of police officers in Chicago. App. I at 6. His vast experience in this area notwithstanding, there was an abuse of discretion when he twice denied the plaintiff's motions.* As he noted in the hearing he does not want to be the "constant superintendent of these hiring practices unless there is * * * an agreement

not to discriminate." App. I at 7. However, based on his own standard, this is precisely the sort of case in which he must allow further discovery and fact-finding on possible violations of the consent decree by the City. The language of the consent decree is crystal clear: the City committed itself to recruiting and hiring municipal employees on a non-discriminatory basis. Instead of imposing an onerous burden on the district court, our decision requires simply that the district judge fulfill his responsibility to ensure that the terms of the consent decree are carried out so that discrimination no longer excludes blacks from contributing to Northlake's municipal work force.

The district court's denial of the government's motion for reconsideration is reversed and the cause is remanded for further discovery and an opportunity for the government to show its entitlement to supplemental relief.

---

* The motion for supplemental relief and an order permitting discovery was denied by minute order of January 10, 1990. The motion for recon-

sideration was denied by minute order of February 8, 1990.