983 F.2d 1070
 36 ERC 1465, 23 Envtl. L. Rep. 20,815
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
City of Louisville, Intervening Plaintiff-Appellee,
v.
LOUISVILLE AND JEFFERSON COUNTY METROPOLITAN SEWER DISTRICT,
Defendant-Appellant,
Commonwealth of Kentucky, Defendant-Appellee.
 No. 91-6461.
 United States Court of Appeals, Sixth Circuit.
 Jan. 12, 1993.
 
 Before MERRITT, Chief Judge, and RALPH B. GUY, Jr. and RYAN, Circuit Judges.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Defendant, Metropolitan Sewer District, appeals the district court's order terminating a 1981 consent decree. On appeal, defendant argues that the purpose of the consent decree has not been achieved and therefore the court should not have terminated the decree. We agree with the district court that the purpose of the consent decree has been accomplished and therefore affirm.
 
 I.
 
 2
 Louisville and Jefferson County Metropolitan Sewer District (MSD) was created pursuant to enactments of the Kentucky Legislature, Ky.Rev.Stat. § 76.010, to develop and operate a sanitary and storm sewer system in Jefferson County, Kentucky. In the late 1970s, defendant contracted with Blount Brothers to build the Morris-Foreman Waste Water Treatment Plant (MFWTP), which was completed in 1974. The design plans, approved by the Environmental Protection Agency, anticipated sewage flow of 105 million gallons per day. MFWTP was issued a National Pollutant Discharge Elimination System (NPDES) permit by the EPA in 1977 pursuant to applicable provisions of the Clean Water Act. This permit required MSD to meet specific effluent limitations for biochemical oxygen demand (BOD) and total suspended solids (TSS). Unfortunately, substantial defects in design caused the plant's effluent to exceed its permit limits. Major litigation ensued between MSD and Blount Brothers, resulting in a multi-million dollar settlement. However, MSD was still faced with a plant that was not complying with its permit requirements.
 
 
 3
 In April 1978, the EPA brought an enforcement action against MSD for violating the plant's permit. MSD faced civil penalties of $10,000 per day for violating its permit. 33 U.S.C. § 1319(d) (1986). Over the next two years, the parties came to an agreement, memorialized in a "Memorandum of Understanding," and entered into a consent decree. According to appendix A of the consent decree, MSD was to undertake two steps to bring the plant into compliance with its permit. MSD was to conduct an "Interim Corrective Action Program" to ascertain if limited improvements to the plant could bring about compliance with applicable effluent limitations and an "Evaluation Program" to determine the relative feasibility and economic efficiency of alternative improvements. If these steps showed that the MFWTP could not achieve compliance with applicable effluent limitations without major physical modifications, then MSD was to submit a "Final Plan and Schedule" detailing the major physical modifications and equipment modification required. According to the consent decree, "[u]pon approval by EPA Region IV, MSD shall carry out that Final Plan and Schedule." (App. 62). The agreement also established those items EPA would fund and would not fund, those items the parties disagreed on funding, and those items the EPA felt were eligible for funding but would not approve unless shown to be necessary. The consent decree provided:
 
 
 4
 Although § 1319(d) of 33 U.S.C. provides that penalties may be sought for violation of applicable effluent limitations, EPA has elected not to seek such penalties in this instance in light of MSD's substantial efforts including both studies and physical work to correct the deficiencies which have prevented MFWTP from achieving applicable effluent limitations.
 
 
 5
 (App. 54).
 
 
 6
 MSD proceeded to undertake the actions required by the consent decree, completing the Interim Corrective Action Program and Evaluation Program. The Final Plan and Schedule was submitted to the EPA in 1984. One item MSD felt was needed was an additional UNOX reactor, also referred to as Battery D. The EPA disagreed with the necessity of this item. In 1985, the EPA approved the Final Plan and Schedule, except for the additional UNOX reactor.
 
 
 7
 While the various studies were being conducted, events were changing the volume and quality of the sewage coming into the plant. In 1981, a substantial portion of MSD's sewer system was destroyed by a series of explosions. Additionally, industrial sewage began to diminish in the area. Carl Neumayer, the director of operations and maintenance of MSD, stated in his affidavit:
 
 
 8
 As a result of the decrease in industrial sewage discharged into MSD's system, coupled with the Interim Corrective Actions undertaken by MSD in compliance with the Consent Decree, the quality of MSD's discharge effluent began to consistently meet the BOD and TSS effluent limitations set forth in MSD's EPA-issued discharge permit.
 
 
 9
 (App. 116). The parties agree that, from 1986 until 1989 and for several months in 1990, the plant was meeting the permit requirements. In July 1990, the EPA moved for a termination of the consent decree, "certif[ying] that the defendants have fully complied with the provisions of the Consent Decree." (App. 64).
 
 
 10
 In the meantime, in 1989, MSD had requested the EPA to re-evaluate the need for the additional UNOX reactor that the EPA omitted from its approval of the Final Plan and Schedule. Under the Clean Water Act, the EPA can give grants to assist the construction of wastewater treatment plants. 33 U.S.C. § 1281(g) (1986 & Supp.1992). But, under the complex procedures for grants, the EPA must wait until the state has certified a project and has determined that the project has priority over other works within the state. 33 U.S.C. § 1284(a)(3) (1986). On July 20, 1989, the EPA, following the established procedures for grants under the Clean Water Act, authorized the Commonwealth of Kentucky to review MSD's request for a re-evaluation of the need for the additional UNOX reactor. On August 17, 1990, after the EPA filed its motion for termination of the consent decree, MSD submitted a proposal for bioroughing towers, in lieu of the UNOX reactor, to the Commonwealth of Kentucky, arguing it was required because of additional sludge flows that were not included or anticipated in the development of the Final Plan. As Carl Neumayer explained in his affidavit:
 
 
 11
 MSD has been consistently expanding its sewer lines throughout Jefferson County in compliance with the mandate imposed by KRS 76.010 in order to accommodate area development, population expansion and public health needs. In addition, MSD has assumed responsibility for treating sewage previously treated by private package sewage treatment plants so as to eliminate discharge of inadequately treated sewage into Kentucky's waterways. In the last several years industrial discharges into MSD's sewer system have increased. As a result, despite MSD's application of its best efforts, the MFWTP during significant portions of 1989 and 1990 has failed to achieve the effluent limitations imposed by the EPA-issued discharge permit.
 
 
 12
 (App. 116-17). Kentucky certified the bioroughing towers on August 22, 1990, one month after the government sought to terminate the consent decree. On October 1, 1990, the EPA approved funding for the project. MSD projects the bioroughing towers' completion date to be sometime in 1995.
 
 
 13
 On July 3, 1991, the district court entered its order terminating the consent decree. After MSD moved the court to reconsider its order, the court entered its final order terminating the consent decree on November 8, 1991. MSD argued, as it does on appeal, that until the bioroughing towers are completed the Final Plan and Schedule has not been "carried out" becuase the UNOX reactor (substituted with the bioroughing towers) was in MSD's proposed Final Plan. In it's memorandum, the court explained:
 
 
 14
 The parties agree that a Consent Decree must remain in effect so long as its continued enforcement is necessary to effectuate its purposes. The purpose of the Consent Decree in the case at hand was to bring MFWTP into compliance with the law.[5] The parties' argument over when the Consent Decree may properly terminate stems from conflicting interpretations of critical terms of the Decree. MSD argues that all the work identified in the FP & S has not been completed and therefore, the Consent Decree may not be terminated. The United States argues that MFWTP's compliance with effluent limitations at any stage of major modifications, set forth in the FP & S and approved by EPA, require termination of the Consent Decree.
 
 
 15
 Consent decrees have been recognized as having attributes of both contracts and judicial acts. United States v. ITT Continental Baking Co., 420 U.S. 223, 236 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975); United States v. Armour & Co., 402 U.S. 673, 681-82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). Principles of contract law are used for purposes of interpreting the meaning of a consent decree. Only when the language of a consent decree is not clear on its face, have courts been forced to resort to equitable considerations to define the limits of a consent decree. Chrysler Corp. v. United States, 316 U.S. 556, 62 S.Ct. 1146, 86 L.Ed. 1668 (1942).
 
 
 16
 We find that the language of the decree is quite clear and that its purposes have been accomplished.
 
 
 17
 Appendix A of the Consent Decree provides for MSD to undertake a series of interim steps to determine whether limited improvements would bring about compliance with "applicable effluent limitations." A cost effectiveness analysis of suggested major plant modifications was to be implemented in the event that the interim steps did not result in compliance and only then was the FP & S to be developed by MSD. Nothing in the language of the Consent Decree or the Memorandum of Understanding compels the conclusion that the EPA was required to approve the entire FP & S as initially submitted by MSD. It appears from the face of the Consent Decree that MSD's requirement to implement any of the FP & S was contingent on EPA's approval of any part of the FP & S. The record shows that MSD formally approved the FP & S and found MSD to be in compliance with "applicable effluent limitations" in November of 1988. MSD does not deny that it was in compliance with the renewed NPDES permit in November of 1988 and it had been in compliance until 1990. Therefore, the duties of EPA and MSD under the terms of the Consent Decree ended as of November, 1988. The July 20th, 1989, letter to KNREPC from the EPA does not suggest that the EPA changed its position as to the requirements of the Consent Decree.
 
 
 18
 In addition, Section V of the Consent Decree contemplates that the "applicable effluent limitations" referred to throughout the Consent Decree are those limitations imposed by the NPDES permit issued in 1977 and the renewed permit which expired in 1987. MSD requested approval of Battery D from the KNREPC based on a projected increase in effluent flow and the heightened requirements of a proposed NPDES permit.
 
 II.
 
 19
 On appeal, defendants dispute the government's assertion and the district court's conclusion that the purpose of the consent decree has been met. MSD argues that the purpose of the consent decree was to bring the MFWTP into compliance with its permit limits while operating at its design capacity of 105 million gallons of sewage flow per day.
 
 
 20
 Defendant initially opposed the entering of the consent degree, taking "the position that the more appropriate means of resolving the issues would be an extension of its existing NPDES permit ... or an administrative order." (App. 86). Thus, we confront the facial anomaly, recognized by the district court in its memorandum and order denying defendant's request for a stay, issued July 2, 1992, of a defendant arguing it has not completed all the requirements of the consent decree and therefore the decree should not be terminated. Normally, liability under the Clean Water Act is strict, regardless of how efficiently an individual operates a plant. See United States v. Texas Pipeline Co., 611 F.2d 345 (10th Cir.1979). Through the consent decree, defendant was allowed to avoid penalties so long as it, in good faith, used its best efforts to run the plant as efficiently as possible and take the required steps in the consent decree. Although defendant did consistently meet its permit requirements for several years in a row, it seeks to maintain the protection from the potential $25,000 a day in civil penalties until installation and testing of the bioroughing towers is completed.[1]
 
 
 21
 Defendant argues that the only reason the plant was able to meet its permit requirements for those years was due to a decrease in sewage flow and a concurrent increase in the "quality" of incoming sewage. MSD asserts that the government's position taken to the extreme is ludicrous: the plant could have met the permit requirements from day one by reducing its intake. However, MSD fails to see the parallel in its argument; taken to its extreme, MSD's position is untenable. What if the bioroughing towers fail to bring the plant within its permit limits while operating at the design capacity? Under MSD's proposed analysis of the consent decree, the purpose of the decree would not be achieved, so it must remain in force until additional measures are taken.[2] Presumably, in the interim, MSD could continue to take on more and more customers, thus making the effluent requirements harder to attain.
 
 
 22
 The parties agree that the consent decree should terminate when the purpose of the decree has been fulfilled. They differ significantly on what that purpose is. The "four corners" of a consent decree are examined to determine its scope. Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 574 (1984). We agree with the district court that the purpose of the consent decree was to bring the plant into compliance with the law; indeed, its violation of the law is what prompted the EPA to bring the initial enforcement action. There is no indication in the consent decree that compliance while processing 105 million gallons of sewage was required.
 
 
 23
 This conclusion is further bolstered by an examination of the Clean Water Act's purposes. A consent decree should be construed against the background of the statute under which the action was brought. Las Vegas v. Clark County, 755 F.2d 697, 702 (9th Cir.1985); United States v. Motor Vehicle Mfrs. Ass'n of the United States, Inc., 643 F.2d 644, 650 (9th Cir.1981). The Clean Water Act does not contemplate compliance with NPDES permits while operating at design capacity; it requires compliance with permits, period. If a plant must reduce its sewage intake to comply, then that step must be taken. Further, the NPDES permits have a duration of five years, 33 U.S.C. § 1342(b)(1)(B) (1986), and, as a general rule, subsequent permits are supposed to be no less stringent than the one before it. 33 U.S.C. § 1342(o)(1) (Supp.1992). Through continued enforcement of the consent decree, MSD is seeking to be held to the effluent limitations of a permit issued fifteen years ago.
 
 
 24
 MSD argues that, because the additional UNOX reactor was in MSD's original Final Plan and Schedule and that because the EPA eventually approved its construction, MSD should be allowed to complete it without the risk of civil penalties. When the parties entered into the consent decree, the additional UNOX reactor was in the category of those items that were eligible for funding but would not be funded unless their necessity was shown. It was not until after the MFWTP had been meeting its permit limits for several years that an increase in sewage quantity caused the EPA, through the Commonwealth of Kentucky, to find the additional UNOX reactor (substituted by the bioroughing towers) necessary. The 1978 consent decree's purpose was not to correct the design problems of the MFWTP for future increase sewage flow, but to correct the problems so that the then current effluents met the permit limits. Indeed, the EPA seemed correct in its evaluation of the need for the additional UNOX reactor. The modifications the EPA approved without the UNOX reactor helped the MFWTP to finally achieve its permit limits, and to do so for several years.
 
 
 25
 Additionally, this litigation is primarily between two institutions--the Environmental Protection Agency and the Louisville and Jefferson County Metropolitan Sewer District.[3]
 
 
 26
 [C]onsent decrees which regulate institutional conduct are fundamentally different from consent decrees between private parties.... [T]hey affect more than the rights of the immediate litigants. The decrees reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions.
 
 
 27
 Heath v. De Courcy, 888 F.2d 1105, 1109 (6th Cir.1989). Considering the public's interest in compliance with the Clean Water Act, we are not prepared to say that a plant that was able to comply with its required effluent limitations for several years should now be allowed to again violate its permit with impunity while constructing new equipment. For 11 years, MSD has been allowed to use its "best efforts" to fix the problems at the plant without the fear of stiff civil penalties, and for several years the plant was able to comply with its permit. As the district court recognized, the purpose of the consent decree was achieved.
 
 
 28
 AFFIRMED.
 
 
 29
 MERRITT, Chief Judge, dissenting.
 
 
 30
 The consent decree is a contract between the government and the sewer district. I disagree with the Court's holding that "the purpose of the consent decree was achieved" and that the decree should, therefore, be terminated. The "effluent limitations" were met for only a short period at very low levels of discharge. The sewer district is now building two oxygenation towers to correct the problem. This work will cause part of the plant to remain shut down until completion. These additions are the type of improvements contemplated in the decree. The decree was entered to give the sewer district a chance to make such improvements. While this new construction is going on, the plant cannot meet effluent limitations. Although the agreement is more than a decade old, the plant cannot meet the standards in part because the EPA did not authorize construction of the new towers until 1990.
 
 
 31
 There is no suggestion in the record that the district has not done everything it can under the consent decree to comply with the effluent standards. The sewer district advised EPA years ago that the towers would be needed, but EPA disapproved until two years ago. With construction incomplete, why should the decree end now? Why now subject the district to another lawsuit and to $25,000 a day in penalties. If the district is breaching the decree, it should be required to comply, but there is no such claim. And there is no claim that the plant has ever met effluent limitations at its design capacity or at its present levels of effluent discharge.
 
 
 32
 It may be administratively more convenient for EPA to have the agreement terminated now. It may be unfair to some cities which have no comparable agreement to require them to pay penalties when they fail to meet effluent limitations. It may be that EPA made a bad deal when it signed this consent decree. But none of these are reasons which justify termination of the settlement agreement. The only reason the government gives as a justification for seeking termination--"the purpose of the decree has been satisfied"--is simply not the case. There may be other reasons to terminate the agreement, but this one is a legal fiction. It sets a bad precedent to allow the contract to be set aside on this basis. I would not simply defer to the government in such matters of contract construction and enforcement. The government is, after all, a party to the contract.
 
 
 
 [5]
 "The authority of a federal district court to adopt a consent decree comes only from the statute which the decree is intended to enforce. If there is a 'purpose' to the effectuated, it is the purpose of the statute pursuant to which the government seeks relief. Within that framework the parties strike their bargain." United States v. Motor Vehicle Manufacturers Assoc. of the United States, 643 F.2d 644, 650 (9th Cir.1981)
 Ap. 176-178) (footnote 6 omitted).
 
 
 [1]
 When this action was first brought, the civil penalties were $10,000 per day. The Clean Water Act has since been amended to provide for civil penalties up to $25,000 per day. 33 U.S.C. § 1319(d) (Supp.1992)
 
 
 [2]
 "The whole purpose of the Consent Decree was to correct [the plant's] defects. It follows that until all the defects are corrected, the purpose of the Consent Decree has not been met." (Def's Brief at 16). To counteract the extremity of their position, defendant, in response to the government's motion to terminate the consent decree, moved for modification of the decree setting a date certain for its termination
 
 
 [3]
 Also party to this litigation are the Commonwealth of Kentucky, defendant now aligned with the plaintiff, and the City of Louisville, intervening plaintiff