RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0257p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

EVOQUA WATER TECHNOLOGIES, LLC,
        *Plaintiff-Appellant/Cross-Appellee*,

    *v.*

M.W. WATERMARK, LLC; MICHAEL GETHIN,
Individually,
        *Defendants-Appellees/Cross-Appellants*.

    Nos. 18-2397/2398

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:16-cv-00014—Robert J. Jonker, District Judge.

Argued: June 27, 2019

Decided and Filed: October 7, 2019

Before: WHITE, BUSH, and LARSEN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Craig R. Smith, LANDO & ANASTASI, LLP, Cambridge, Massachusetts, for Appellant/Cross-Appellee. G. Thomas Williams, MCGARRY BAIR PC, Grand Rapids, Michigan, for Appellees/Cross-Appellants. **ON BRIEF:** Craig R. Smith, Eric P. Carnevale, LANDO & ANASTASI, LLP, Cambridge, Massachusetts, for Appellant/Cross-Appellee. G. Thomas Williams, MCGARRY BAIR PC, Grand Rapids, Michigan, for Appellees/Cross-Appellants.

    WHITE, J., delivered the opinion of the court in which BUSH and LARSEN, JJ., joined. BUSH, J. (pp. 19–35), delivered a separate concurring opinion.

_____

**OPINION**

_____

HELENE N. WHITE, Circuit Judge.   In 2016, Plaintiff Evoqua Water Technologies, LLC ("Evoqua") filed this action against Defendants M.W. Watermark, LLC ("Watermark") and Michael Gethin, asserting copyright, trademark, and false-advertising claims and seeking to enforce a 2003 consent judgment obtained by Evoqua's alleged predecessor against Watermark and Gethin.   The district court dismissed Evoqua's claim that Watermark and Gethin were in contempt for violating the consent judgment, holding that the consent judgment was not assignable and therefore Evoqua lacked standing to enforce it.   The district court also granted Watermark and Gethin summary judgment on Evoqua's copyright claim after concluding that the agreement selling assets to Evoqua unambiguously did not transfer copyrights.   A jury later returned a verdict for Watermark and Gethin on Evoqua's false-advertising claim and for Evoqua on its trademark-infringement claim against Watermark but found that Gethin was not personally liable.   Following trial, the district court denied Watermark's and Gethin's requests for attorney's fees on Evoqua's copyright and false-advertising claims.   We conclude that the consent judgment is assignable, that the agreement transferring assets to Evoqua is ambiguous regarding copyrights, and that the district court did not abuse its discretion in declining to award Watermark and Gethin attorney's fees on the false-advertising claim.   Accordingly, we VACATE the district court's dismissal of Evoqua's claim seeking to hold defendants in contempt of the consent judgment; VACATE the district court's grant of summary judgment on the copyright claim; AFFIRM the district court's denial of defendants' request for attorney's fees on the false-advertising claim; and REMAND for further proceedings.

## I.    BACKGROUND

### A.    The Parties

Evoqua and Watermark manufacture and sell equipment, such as sludge dryers and filter presses, that removes water from industrial waste.   Both companies also sell replacement parts for used de-watering equipment originally manufactured by them or by other companies.

Evoqua's business can be traced back to a corporation called JWI, Inc. JWI was incorporated in the late 1970s and was acquired by U.S. Filter Corporation in 1997 to form a business called U.S. Filter/JWI Inc. ("U.S. Filter/JWI"). In 2006, U.S. Filter/JWI merged into Siemens Water Technologies Corp. and dissolved. In 2011, Siemens Water Technologies Corp. merged into Siemens Water Technologies Holding Corp., which then merged into Siemens Industry, Inc. ("Siemens"). On March 28, 2013, Siemens sold its water technologies business to Siemens Water Technologies LLC ("SWT"). SWT changed its name to Evoqua Water Technologies LLC in 2014.

M.W. Watermark LLC was formerly named J-Parts LLC. J-Parts was founded by Gethin in 2003 after he left his position at U.S. Filter/JWI. J-Parts initially sold only replacement parts for filter presses manufactured by other companies.

### B.     2003 Action and Consent Judgment

Shortly after Gethin formed J-Parts LLC, U.S. Filter/JWI filed an action against Gethin and J-Parts, LLC in *Gethin I* (Case No. 03-00127) in the Western District of Michigan for false designation of origin, trademark dilution, trademark infringement, unfair competition, unjust enrichment, misappropriation of trade secrets, breach of fiduciary duties, breach of contract, and conversion. U.S. Filter/JWI alleged, among other things, that Gethin had downloaded a large quantity of U.S. Filter/JWI's proprietary and trade-secret information before leaving his position and that the defendants were infringing on its J-PRESS® (the brand for its filter presses) and J-MATE® (the brand for its sludge dryers) trademarks by using the "J-Parts" name.

The parties settled the case and reached a final settlement agreement. As part of the settlement agreement, the parties agreed to stipulate to the entry of a final judgment, and the district court entered the "Final Judgment Including Permanent Injunction."[1] (R. 1-7.) The injunction permanently enjoined "M.W. Watermark LLC, and Michael Gethin and its, his or their principals, agents, servants, employees, attorneys, successors and assigns" from using U.S.

---

[1]The "Final Judgment Including Permanent Injunction" will hereinafter be referred to as the "Consent Judgment" or "Permanent Injunction."

Filter/JWI's trademarks and from "using, disclosing, or disseminating any" of U.S. Filter/JWI's proprietary information. (*Id.* at PID 358.)

### C.     Sale to SWT

The business unit comprising U.S. Filter/JWI's business was sold to SWT pursuant to a Carve-Out Agreement between Siemens and SWT. Under the Carve-Out Agreement, SWT acquired "all Seller's books and records, files and other documents and data (including written and electronic training materials utilized to train the employees of the [water-technologies unit], including those related to regulatory and compliance matters), including all purchase and sold ledgers, purchase and sales day books and purchase and sales invoices." (R. 48-1, PID 780.)

SWT also acquired the business unit's "Know-how," defined as:

> all information and data (irrespective as to whether such information and data is available by way of documentation, orally or in electronic format and irrespective as to whether they are protected by copyrights or not), including business and trade secrets, technical and business information and data, inventions, experience and expertise, all to the extent that such information and data are not Software . . . and/or not a Patent . . . .

(*Id.* at PID 783.)

SWT further acquired the business unit's rights and obligations under its contracts, its trademarks, and its interest in litigation.

### D.     Siemens/SWT's Market Exit and Watermark's Entrance

Before selling the water-technologies unit to SWT in 2013, Siemens had prepared a multi-year plan to discontinue certain product lines, including J-MATE® sludge dryers. Following the sale, in early 2014, Evoqua notified its sales representatives that it was discontinuing the J-MATE® product line. In response to Evoqua's planned exit, Watermark decided to enter the sludge-dryer market. On March 23, 2014, Watermark announced that it was releasing a sludge dryer product called "DryMate."

**E.     Evoqua's Re-entrance into the Sludge-Dryer Market**

On July 9, 2015, Evoqua began plans to reintroduce the J-MATE® sludge dryer to the market.  Around that same time, Evoqua's in-house counsel wrote to Watermark regarding, among other things, Evoqua's concerns that Watermark was violating the Consent Judgment, improperly using Evoqua's trademarks, and falsely advertising that it provided "OEM Parts" for a variety of manufacturers, including JWI.

## II.     PROCEDURAL HISTORY

**A.     Evoqua's Claims**

On January 8, 2016, Evoqua filed this action against M.W. Watermark, LLC, Watermark's President Gethin, and current and former employees of Watermark.  Evoqua alleged that Watermark and its employees violated the Consent Judgment by using Evoqua's proprietary information and infringing on its trademarks.  Evoqua further alleged that Watermark infringed on its copyrights by adopting Evoqua's copyrighted brochures and presentations for its own use.  Evoqua also asserted that Watermark impermissibly used its J-MATE® trademark on its website and adopted a confusingly similar name of "DryMate" for its own product.  Evoqua finally alleged that Watermark falsely advertised itself as an original equipment manufacturer for Evoqua's products.

**B.     The District Court's Contempt Order**

Evoqua filed a motion for sanctions and/or an order holding Watermark and Gethin in contempt of court for allegedly violating the Permanent Injunction.  On September 12, 2016, the district court granted that motion and held Gethin and Watermark in contempt for violating the Permanent Injunction.  The court found that Watermark violated the injunction by (1) using Evoqua's proprietary information and (2) using Evoqua's trademarks on its website.  The district court ordered Watermark and Gethin to pay sanctions and requested briefing on the amount. However, before the award was issued, the case was reassigned to another judge.

**C.    The District Court's Order Vacating the Contempt Order and Ruling that Evoqua Lacks Standing**

On April 7, 2017, Watermark and Gethin moved for an order dissolving or modifying the Permanent Injunction, arguing that the Permanent Injunction's requirements had either been satisfied or had become unworkable.  Noting that the parties disputed whether Evoqua was a successor-in-interest, the district court entered an order declining to rule on the motion until resolving that issue and asked for briefing.

At the hearing on Watermark's and Gethin's motion for relief from the permanent injunction and on the successor-in-interest issue, the district court raised the question whether the Permanent Injunction could be enforced by successors to U.S. Filter/JWI and asked for briefing. After the parties briefed the question, the district court issued an opinion and order vacating the contempt order and dismissing Evoqua's claim for contempt.  The district court held that Evoqua did not have standing to seek enforcement of the Permanent Injunction because "[t]he consent judgment in this case does not provide for enforcement by an assignee of U.S. Filter."  (R. 154, PID 6976.)

**D.    The District Court's Grant of Summary Judgment to Defendants on Evoqua's Copyright Claim**

On October 23, 2017, Watermark and Gethin moved for summary judgment on Evoqua's three remaining claims: trademark infringement, false advertising, and copyright infringement. The district court granted Watermark's and Gethin's motion for summary judgment on the copyright-infringement claim on the basis that the Carve-Out Agreement between Siemens and SWT/Evoqua unambiguously did not transfer copyrights to SWT/Evoqua.  The district court rejected Evoqua's argument that the agreement's transfer of "Know-how" transferred copyrights.

**E.    Jury Verdict in Favor of Watermark and Gethin on the False-Advertising Claim and for Evoqua on the Trademark Claim**

Evoqua's remaining claims for trademark infringement and false advertising were tried before a jury.  The jury returned a verdict for Watermark and Gethin on the false-advertising claim and for Evoqua on its trademark-infringement claim, but awarded $0 in damages, found no willful infringement, and found that Gethin was not personally liable.

After trial, Watermark and Gethin filed a motion for attorney's fees, requesting attorney's fees as the prevailing party on the copyright-infringement claim and attorney's fees on the false-advertising claim because Evoqua's conduct with respect to that claim was exceptional. The district court denied both requests. The district court declined to award attorney's fees for false advertising under the Lanham Act, finding that the parties presented conflicting evidence about the meaning of "OEM [original equipment manufacturer] parts" and that Evoqua pursued the claim in good faith. (R. 274, PID 10306 (quoting 15 U.S.C. § 1117(a)).)

Evoqua appeals (1) the district court's order vacating the contempt order and dismissing Evoqua's contempt claim, and (2) the district court's grant of summary judgment to Watermark and Gethin on the copyright claim. Watermark and Gethin appeal the district court's denial of their requests for attorney's fees on the copyright and false-advertising claims.

## III.     THE ASSIGNABILITY OF THE CONSENT JUDGMENT

### A. Standard of Review and Legal Standard

"A district court's interpretation of a consent decree or judgment is a matter of law subject to de novo review, and the underlying findings of fact are reviewed for clear error." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 371 (6th Cir. 1998). This court reviews a district court's decision on standing de novo. *See United States v. Real Prop., All Furnishings Known as Bridwell's Grocery*, 195 F.3d 819, 821 (6th Cir. 1999).

"A consent decree has attributes of both a contract and of a judicial act." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983). "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms." *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). "[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Id.* at 682. The consent decree is a judicial act because it "places the power and prestige of the court behind the compromise struck by the parties." *Williams*, 720 F.2d at 920. A court must "protect the integrity of the decree with its contempt powers." *Id.*

A consent decree "is not enforceable directly or in collateral proceedings by those who are not parties to it." *Blue Chips Stamps v. Manor Drug Stores*, 421 U.S. 723, 750 (1975). "[E]ven intended third-party beneficiaries of a consent decree lack standing to enforce its terms." *Aiken v. City of Memphis*, 37 F.3d 1155, 1168 (6th Cir. 1994).

In the absence of controlling federal law, contractual interpretation of the Consent Judgment is governed by Michigan law. *See Sault St. Marie*, 146 F.3d at 372. Under Michigan law, "[t]he primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994). A court "must look for the intent of the parties in the words used in the instrument." *Mich. Chandelier Co. v. Morse*, 297 N.W. 64, 67 (Mich. 1941).

Of particular relevance here, the Supreme Court addressed the scope of a consent decree in *Armour*. There, Greyhound Corporation sought to acquire the majority of stock in Armour & Co. The government had previously entered into a consent decree with Armour, barring it from "dealing directly or indirectly in certain specified commodities." *Armour*, 402 U.S. at 673-74. The government sought to enforce the consent decree against Greyhound, arguing Greyhound engaged in business that would violate the decree. *Id.* at 677. The Court reasoned that the consent-decree prohibitions ran "only against the named stockholders [of Armour] and not against their successors and assigns." *Id.* at 680. Noting that a "'successors and assigns' clause" would have made the Government's argument more persuasive and that the consent judgment explicitly bound Armour's successors and assigns in other respects, the Supreme Court held that the consent decree did not bar Armour's successors from dealing in the specified commodities. *Id.* at 683.

## B.    The Consent Judgment is Assignable.

Under Michigan contract law, "rights can be assigned unless the assignment is clearly restricted." *Jawad A. Shah, M.D., PC v. State Farm Mut. Auto. Ins. Co.*, 920 N.W.2d 148, 158 (Mich. Ct. App. 2018) (internal quotation marks omitted). The Consent Decree is silent on the question of assignability—neither allowing it nor barring it. Due to the absence of a "clear restrict[ion]," the Consent Decree was assignable to Evoqua.

Relying on *Thatcher v. Kohl's Department Stores, Inc.*, 397 F.3d 1370, 1372 (Fed. Cir. 2005), the district court came to the opposite conclusion.  In *Thatcher*, a consent decree enjoined Kohl's Department Stores, and its successors-in-interest, from infringing on Mark Thatcher's patent rights.  397 F.3d at 1372.  The consent decree did not expressly extend the right of enforcement to anyone other than Mark Thatcher.  *Id.*  Thatcher sold his patent rights to a third party, Deckers Outdoor Corporation, and Deckers later tried to enforce the consent judgment against Kohls.  *Id.* at 1372-73.  Relying on the "underlying policy" of *Armour* and its interpretation of "the contract as a whole," the court rejected Decker's argument that the absence of an anti-assignment clause meant that the consent judgment was freely assignable.  *Id.* at 1374. Analyzing *Armour*, *Thatcher* (1) noted that *Armour* "promotes the underlying policy that consent judgments must be construed in a manner that preserves the position for which the parties bargained" and (2) stated that "*Armour* makes clear that . . . [consent judgments] are fundamentally different from contracts in not only reflecting an agreement on terms but also a resolution and compromise of contested legal positions in matters that are the subject of litigation."  *Id.*  In light of its interpretation of *Armour*, the court found the consent decree's silence on extending the right of enforcement to third parties was "the functional equivalent of the parties' express intent to exclude language of assignment."  *Id.* at 1375.  The district court found this case similar to *Thatcher*, and interpreted the absence of any reference to U.S. Filter/JWI's successors and assigns, coupled with the language binding Watermark's successors and assigns, as preventing assignment of the Consent Judgment.

We reject this reasoning.  The Consent Decree's mere silence on the question of assignability does not evince an intent to prohibit assignment.  Michigan law allows for the assignment of a contract unless clearly restricted.  *Shah, M.D., PC*, 920 N.W.2d at 158.  Further, that the Consent Judgment explicitly binds Watermark's successors and assigns but does not address U.S. Filter/JWI's successors and assigns makes sense in light of the fact that the Consent Judgment addresses only Watermark's future actions and obligations—that it may not infringe on certain trademarks or use U.S. Filter/JWI's proprietary information—and does not address U.S. Filter/JWI's.  *Thatcher* had a much stronger basis for concluding that the consent judgment could not be assigned.  The consent judgment there *explicitly* provided Thatcher the right to enforce the consent judgment without providing his assigns that right.  *See Thatcher*, 397 F.3d at

1373 ("No one other than Thatcher was expressly given the right to proceed with a contempt action to enforce the judgment under the terms of the consent judgment."). Here, the Consent Judgment is silent on enforcement.

Moreover, we do not read *Armour* to require explicit language allowing for assignment. *Armour*'s statement that the interpretation of a consent decree must preserve the parties' bargained-for terms does not suggest that an assignment clause is needed. *Armour*'s statement simply mirrors the general contract-interpretation command to "honor the intent of the parties," *Rasheed*, 517 N.W.2d at 29 n.28, by looking to "the words used in the instrument," *Mich. Chandelier Co.*, 297 N.W. at 67. Nor does *Armour* suggest that the judicial nature of the Consent Judgment requires an explicit assignment clause in this circumstance. *Armour* simply noted that a "successors and assigns" clause would have made the government's argument for successor liability more persuasive. The *Armour* Court also relied on the fact that the consent judgment elsewhere had bound Armour's successors and assigns, which is not the case here.

Because the Consent Judgment does not contain an anti-assignment clause or some other clear prohibition on assignment, the Consent Judgment could be assigned. The district court erred by concluding to the contrary.

Watermark and Gethin raised other issues before the district court, including whether the Consent Judgment was actually assigned to Evoqua. Because the district court addressed only the assignability of the Consent Judgment, we vacate the dismissal of Count I and remand to allow the district court to address the arguments in the first instance.

## IV.     EVOQUA'S OWNERSHIP OF THE COPYRIGHTS

### A.     Standard of Review and Legal Standard

We review the district court's decision granting summary judgment de novo. *See Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 842 (6th Cir. 2015). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In reviewing the district court's decision to grant summary judgment, we must view all

evidence in the light most favorable to the nonmoving party." *Cincinnati Ins. Co. v. Zen Design Grp., Ltd.*, 329 F.3d 546, 552 (6th Cir. 2003) (citation omitted).

"To succeed in a copyright infringement action, a plaintiff must establish that he or she owns the copyrighted creation, and that the defendant copied it." *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003) (citation omitted). The Copyright Act provides that "the ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law." 17 U.S.C. § 201(d)(1). However, the assignment of a copyright must be made in writing. 17 U.S.C. § 204(a). "[S]o long as the parties' intent is clear, a transfer of copyright need not include any particular language." *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 391 (6th Cir. 2007) (internal quotation marks omitted).

Under the choice-of-law provision in the Carve-Out Agreement, Delaware law governs interpretation of the agreement. "[W]hether a contract is unambiguous is a question of law." *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 n.68 (Del. 2019).

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). "[A]n ambiguity exists when the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings." *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (alterations and internal quotation marks omitted). "Where a contract is ambiguous, the interpreting court must look beyond the language of the contract to ascertain the parties' intentions." *Id.* (internal quotation marks omitted).

### B.     The Carve-Out Agreement is Ambiguous.

The district court concluded that the Carve-Out Agreement unambiguously did not transfer any copyrights to SWT/Evoqua, and held that Evoqua did not establish actual ownership of the copyrights. We disagree.

Section 1.1 of the agreement provides that Siemens "sells and transfers . . . all of [Siemens's] right, title and/or interest . . . in, and to, all assets . . . exclusively pertaining to the [water-technology business]."  (R. 48-1, PID 779.)  Section 1.1 expressly excludes from this transfer "[intellectual property (IP)] . . . , trademarks and their applications, domains and any other intellectual property rights."  (*Id.*)

Section 2 of the agreement sells and assigns IP.  Evoqua contends that Section 2.2 addressing the sale of "Know-how" transferred copyrights to it.  Section 2.2 provides:

> Sale and Assignment of Know-how:  . . . . Seller hereby sells and assigns to Purchaser all information and data (irrespective as to whether such information and data is available by way of documentation, orally or in electronic format and irrespective as to whether they are protected by copyrights or not), including business and trade secrets, technical and business information and data, inventions, experience and expertise, all to the extent that such information and data are not Software (as defined in Section 2.3 below) and/or not a Patent (collectively herein "**Know-how**") which (i) is exclusively used by the Business in the Business Field on the Effective Date, and (ii) which Seller has the exclusive authority to dispose of on the Effective Date (herein "**Transferred Know-how**"). . . . The Parties agree that the documentation in which the Transferred Know-how is embodied is already available in the Business and a separate handover of such documentation is therefore not necessary. Should Purchaser within twenty-four (24) months after the Effective Date and on a case-by-case basis nevertheless need a copy of a part of the Transferred Know-how for the operation of the Business, Seller shall, upon written request of Purchaser, provide Purchaser with such copy to the extent available at Seller.

(*Id.* at PID 783-84.)

Section 2.2 of the Carve-Out Agreement is fairly susceptible of two different interpretations and therefore ambiguous.  The plain meaning of "all information and data" is fairly broad and could encompass a wide variety of assets, including copyrights.  Further, "information and data" lacks a qualifier or limiter, thus is susceptible to the interpretation that any copyrights on the information and data are also included.  The word "assign" could be construed broadly.  The Carve-Out Agreement was signed in 2013.  The Ninth Edition of Black's Law Dictionary (2009) defines assign as "[t]o convey; to transfer rights or property." Assign, Black's Law Dictionary 135 (9th ed. 2009).  The Tenth Edition is more specific, defining assign as "[t]o convey *in full*; to transfer (rights or property)."  Assign, Black's Law

Dictionary 142 (10th ed. 2014) (emphasis added). These definitions suggest that all rights encompassed in or underlying the information and data were also transferred. *Cf. SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1213 (10th Cir. 2009) ("[W]hen a party acquires '[a]ll rights and ownership' in a set of items, as was the case here, courts have generally found such language sufficient to satisfy Section 204(a) in the absence of language excepting copyrights or other special circumstances." (collecting cases)).

Further, a reasonable interpretation of the provision that "information and data" are transferred "irrespective as to whether they are protected by copyrights or not" is that copyrights are included in the "information and data" transferred. In other words, both non-copyrighted information as well as information with attendant copyrights were assigned to SWT. Finally, the illustrative list of "information and data"—"business and trade secrets, technical and business information and data, inventions, experience and expertise"—comprises broad and diverse types of assets. In light of the plain language, one could reasonably interpret the language to include the assignment of copyrights.

The district court's reasons for concluding that the agreement unambiguously did not assign copyrights do not bar this other reasonable interpretation.[2]

The district court first reasoned that the words "information and data" are an "odd container" for copyrights because copyrights only protect the manner in which the information or data is expressly used. (R. 217, PID 8171.) The district court's second reason is related: it

---

[2]Watermark and Gethin argue that copyrights can be transferred only if the language of the agreement unambiguously so provides. The sole authority Watermark and Gethin rely on for this proposition is *Shugrue v. Continental Airlines, Inc.*, 977 F. Supp. 280, 285 (S.D.N.Y. 1997). In *Shugrue*, the court held that 17 U.S.C. § 202 requires that an agreement unambiguously transfer copyrights. Section 202 provides in relevant part that "[o]wnership of a copyright . . . is distinct from ownership of any material object in which the work is embodied," so "[t]ransfer of ownership of any material object . . . does not of itself convey any rights to the copyrighted work embodied in the object." The *Shugrue* court interpreted this to mean that "if the language of the transfer is ambiguous, the contract will be read to transfer only the material object, not ownership of the copyright itself." 977 F. Supp. at 285. However, the statutory language does not suggest that requirement. Moreover, this court has previously found that a contract that was ambiguous on its face nonetheless transferred copyrights. *See Gilleland v. Schanhals*, 55 F. App'x 257, 260 (6th Cir. 2003); *see also Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*, 521 F. App'x 453, 460 (6th Cir. 2013) (holding that a material issue of fact existed as to whether party was owner of copyrights where party's consulting agreement gave the other party "ownership of his 'ideas, inventions, improvements, and developments,' as well as signing shop drawings bearing the 'sole property of [the other party]' legend"); *Johnson v. Storix, Inc.*, 716 F. App'x 628, 631 (9th Cir. 2017) (holding that whether the transfer of "all assets" included copyrights was an issue properly for the jury to decide).

fairly pointed out that "there is a difference between assigning information and data and assigning ownership in the work embodying that information and data." (*Id.*) Thus, according to the district court, the transfer could include only free-floating data and information, unaffixed to a document. However, "information and data" could be interpreted to include the information and data as it is found in documents. That interpretation is supported by Section 2.2's provision that if within 24 months after the sale, SWT/Evoqua needed "a copy of *a part of the Transferred Know-how* for the operation of the Business," Siemens would provide "such copy." (*Id.* at PID 784 (emphasis added).) That provision suggests that the transfer includes information and data in physical mediums. Further, although transferring ownership in a copy of work is not tantamount to transferring ownership in the copyright to that work, here the agreement could be reasonably interpreted as transferring the copyright as well. The language that Siemens "assign[s]" the "information and data" is susceptible of the interpretation that information and data are transferred in full, including all rights associated with that information and data.

The district court next interpreted the words "irrespective as to whether they are protected by copyrights or not" in Section 2.2 to suggest that the copyrights were not the object of the assignment. To be sure, that language could be read to suggest that the "information and data" are separate from any copyrights covering them. But it is also susceptible of another reading: the Carve-Out Agreement transfers both information that is copyrighted (and those copyrights) and information that is not copyrighted.

The district court next focused on the illustrative list of "Know-how"—"business and trade secrets, technical and business information and data, inventions, experience and expertise." (R. 48-1, PID 783.) The district court concluded that those items "may each be a form of intangible property, but they are not copyrights." (R. 217, PID 8173.) However, one could reasonably view those terms as illustrating the broad scope of "Know-how." Each term is fairly broad and general, and the list does not necessarily suggest that copyrights to information as it is presented in mediums such as product manuals are not included in know-how.

Contrasting the different transfer language used in Section 2.2 ("assigns") with the language used in Section 1.1 ("transfers . . . all of Seller's right, title, and interest" in non-IP assets), the district court perceived that the "transfer of all right, title and interest" in Section 1.1

is broader than the "assign[ment]" of know-how in Section 2.2. But because both sections use the word "sells," and "assign" could mean to convey in full, the mere difference in language between Section 1.1 and Section 2.2 does not necessarily mean that fewer ownership rights were conveyed in the latter section. The district court also pointed out that Section 1.1.4, transferring "Seller's books and records, files and other documents and data (including written and electronic training materials utilized to train the employees of the Business)," explicitly excludes "any other intellectual property rights." (R. 48-1, PID 780.) The district court considered Section 1.1.4 a "natural place to transfer the copyrights in the manuals and presentations by earlier entities." (R. 217, PID 8173.) However, the agreement clearly contemplates separate sections for transferring non-intellectual-property assets (Section 1) and intellectual-property (Section 2), so it makes sense that copyrights would not be transferred in the section selling assets other than intellectual property.

Finally, the district court noted that Section 2.3 assigned software, a copyrightable asset, and reasoned that it undercut Evoqua's contention that Section 2.2 assigned all copyrights. However, the separate section for Software does not render Evoqua's construction unreasonable. Section 2.2 explicitly excludes "Software" from the definition of "Know-how," and one could reasonably construe Section 2.2 as transferring all copyrights in the "Know-how," and Section 2.3 transferring copyrights to "Software."

In sum, even taking all the reasons together, the Carve-Out Agreement does not unambiguously exclude the transfer of copyrights. Rather, the language of the Carve-Out Agreement is ambiguous. Accordingly, we may look outside the four corners of the contract to determine the parties' intent. *GMG Capital Invs.*, 36 A.3d at 780. Evoqua presented affidavits from representatives of SWT/Evoqua and Siemens in which both assert that it was the parties' intent to sell the copyrights. Because the intent of the parties is a disputed issue of a material fact, the district court improperly granted summary judgment on that basis.[3]

---

[3]Because we conclude that summary judgment to Watermark and Gethin was improper on the copyright claim, we do not reach whether the district court properly denied Watermark's and Gethin's request for attorney's fees on this claim.

In their motion for summary judgment, Watermark and Gethin raised other arguments concerning the alleged deficiencies in the copyright registrations and the chain of title in the copyrights before the sale to SWT. Because the district court decided only that the Carve-Out Agreement did not transfer copyrights, we vacate the grant of summary judgment and remand to allow the district court to consider the parties' remaining arguments.

## V.     ATTORNEY'S FEES ON THE FALSE-ADVERTISING CLAIM

We review a district court's decision whether to award attorney's fees under the Lanham Act for an abuse of discretion. *See Johnson v. Jones*, 149 F.3d 494, 503 (6th Cir. 1998). The Lanham Act permits a court to award attorney's fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117(a). "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).[4] District courts "determine whether a case is exceptional in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id*. (citation omitted)

The district court did not abuse its discretion in denying Watermark and Gethin attorney's fees on the false-advertising claim.

Evoqua's copyright claim is not so weak as to be exceptional. A claim for false advertising under the Lanham Act has the following elements:

> 1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there is some causal link between the challenged statements and harm to the plaintiff.

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999) (citations omitted). Here, as the district court noted, both

---

[4]The Court in *Octane Fitness* was interpreting the Patent Act's fee-shifting provision, but noted that the Lanham Act's fee-shifting provision was "identical." 572 U.S. at 554.

parties presented evidence on whether Watermark's advertisement that it offered "OEM parts" for Evoqua's filter presses was deceptive, and the success of the claim at trial came down to a credibility contest between the parties' respective witnesses.

Watermark's and Gethin's arguments otherwise are unavailing. Watermark and Gethin argue that Evoqua pursued the false-advertising claim even after the allegedly false advertising had been removed. However, as the district court noted, Evoqua could still reasonably pursue the claim if the false advertising had caused it damage or if it believed Watermark would falsely advertise in this way again. Watermark and Gethin also argue that Evoqua pursued the claim to trial knowing that it could not present evidence of damages and offered no evidence of damages at trial. Yet, Evoqua presented evidence that Watermark's use of "OEM" could tend to deceive consumers and that the misrepresentation harmed Evoqua's goodwill and reputation. *See Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 323 (6th Cir. 2001) ("A plaintiff seeking injunctive relief for false advertising faces a lower standard of showing only that the defendant's representations about its product have a tendency to deceive consumers." (emphasis omitted) (internal quotation marks omitted)). Moreover, Evoqua could pursue an injunction even if damages were hard to quantify. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014); *see also Am. Council*, 185 F.3d at 618 (recognizing that a plaintiff could pursue injunctive relief on false-advertising claim).

The district court was also within its discretion to conclude that Evoqua's litigation tactics did not warrant a shift of fees. Watermark and Gethin argue that Evoqua's discovery requests were overbroad, but the district court reasonably found that those requests did not increase Watermark's and Gethin's fees because they simply refused to comply with those requests. The district court further did not err in concluding that although there was evidence that Evoqua thought it could gain a competitive advantage by litigating against Watermark, Evoqua still pursued its claims in good faith. Watermark and Gethin interpret some of Evoqua's materials in the most negative light, yet those materials could also indicate that Evoqua noticed that Watermark was falsely advertising a relationship with Evoqua, and reasonably sought to enjoin those acts and obtain damages.

In sum, the district court did not abuse its discretion in denying Watermark's and Gethin's request for attorney's fees on Evoqua's false-advertising claim.

## VI.      CONCLUSION

For the above reasons, we VACATE the district court's dismissal of Count I of the complaint; VACATE the district court's grant of summary judgment on Evoqua's copyright claim; AFFIRM the district court's denial of Watermark's and Gethin's request for attorney fees on Evoqua's false-advertising claim; and REMAND for further proceedings.

————————————

**CONCURRENCE**

————————————

JOHN K. BUSH, Circuit Judge, concurring.  I join the Majority Opinion in full as it faithfully applies the case law of our circuit.  However, I write separately to address one discrete issue where I believe our precedents are wrong: specifically, the jurisdictional source of the law governing interpretation of a consent decree entered by a federal court.  As the Majority explains, "[i]n the absence of controlling federal law, contractual interpretation of the Consent Judgment is governed by Michigan Law"—i.e., state law.  Majority Op. at 8 (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 371 (6th Cir. 1998)).  Because a consent decree is viewed as a "contract," our circuit interprets it using the state law from where it was entered.  *See John B. v. Emkes*, 710 F.3d 394, 407 (6th Cir. 2013) ("[W]e interpret the consent decree as a contract.  And under Tennessee law, which guides our interpretation of the decree here, our primary goal is to give effect to the parties' intent as expressed in the decree itself." (citations omitted)).

But, we should not forget that the consent decree here was entered by a *federal* court, and that fact makes all the difference, for reasons I will explain.  True, the Supreme Court has described a consent decree as a "contract," but it has never expressly held that state law controls interpretation when the consent decree is from a federal court.  *See, e.g.*, *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236–37 (1975).  I believe a federal rule of decision is appropriate in these circumstances because a judicial decree is an integral component of the Article III power to decide cases and controversies.  Most significantly, applying federal law to this case would warrant a change in its disposition: because the parties expressly contemplated who was subject to the consent decree, federal law (unlike Michigan law) would allow only those expressly identified entities to enforce this particular decree and would not imply that right of enforcement to others, such as Evoqua Water Technologies, LLC ("Evoqua"), not identified by name or description in the decree.  In light of the above, this court would be wise to revisit its precedents on whether to apply state or federal law to federal consent decree interpretation issues.

I.

To understand why federal law should govern interpretation of a consent decree entered in a federal court, it is first important to understand what federal consent decrees are. They are final judgments entered by federal courts. Though typically drafted by the parties, consent decrees are judicially enforceable orders that draw upon the district court's authority to provide the parties with both equitable and legal remedies. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992); *United States v. Swift & Co.*, 286 U.S. 106, 120 (1932); *see also Carson v. Am. Brands, Inc.*, 450 U.S. 79, 86–87 (1981). Indeed, to enter a proposed consent decree, the "decree must spring from and serve to resolve a dispute within the court's subject matter jurisdiction . . . . [It] must come within the general scope of the case made by the pleadings, and must further the objectives of the law upon which the complaint was based." *Local No. 93 Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525 (1986) (citations omitted) (internal quotation marks omitted).

In this respect, a consent decree is dissimilar to an agreement to settle litigation, in which only the litigants have a say and need not meet all the criteria for entry of a court judgment. *Cf. Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381–82 (1994) (observing that "automatic jurisdiction over [settlement agreement] contracts is in no way essential to the conduct of federal-court business"). Unlike a settlement agreement, a consent decree entered in federal district court draws upon the Article III power, and the decree invokes the court's continuing jurisdiction to ensure compliance with its order until the parties have fulfilled their obligations. *See Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983); *see also Bergman v. Mich. State Transp. Comm'n*, 665 F.3d 681, 683–84 (6th Cir. 2011). A settlement agreement lacks these features because it is only a contract between parties made in consideration of the dismissal of the federal lawsuit. *See Kokkonen*, 511 U.S. at 381. Moreover, unless the parties agree to embody the settlement agreement in the district court's order, "enforcement of the settlement agreement is for state courts" as a matter of state contract law. *Id.* at 382.

Federal consent decrees, by their nature, are therefore more than just contractual arrangements between litigants: they are also acts of Article III power. *Swift & Co.*, 286 U.S. at 115 ("We reject the argument for the intervenors that a decree entered upon consent is to be

treated as a contract and not as a judicial act."). It is true that the parties' bargained-for agreement "serves as the source of the court's authority" to enter the decree,[1] but a consent decree is more than just an entry of an order acknowledging the parties' settlement. *See Local No. 93 Int'l Ass'n of Firefighters*, 478 U.S. at 522 (citing *United States v. Ward Baking Co.*, 376 U.S. 327 (1964)); *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). It is a judicial act that results in a final judgment in the case, which in turn, requires the district court to participate as an additional actor, along with the parties, to resolve the case. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 n.7 (2001) ("Private settlements do not entail the judicial approval and oversight involved in consent decrees.").

By entering the consent decree as a final order, the "[j]udicial approval of a settlement agreement places the power and prestige of the court behind the compromise struck by the parties." *Williams*, 720 F.2d at 920. In light of this, the district court has an "independent, jurdicial interest[]" in entering consent decrees "beyond the remedial 'contractual' terms agreed upon by the parties." *EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund*, 925 F.2d 588, 593 (2d Cir. 1991).

As this court has explained, a consent decree may not be entered if the agreement "is illegal, a product of collusion, or contrary to the public interest." *Williams*, 720 F.2d at 920 (citations omitted). In other words, the district court "is more than 'a recorder of contracts' from whom parties can purchase injunctions; it is an organ of government constituted to make judicial decisions." *Local No. 93, Int'l Ass'n of Firefighters*, 478 U.S. at 525 (internal quotation omitted); *see also In re Pearson*, 990 F.2d 653, 658 (1st Cir. 1993) ("Put bluntly, 'parties cannot, by giving each other consideration, purchase from a court of equity a continuing injunction.'" (quoting *Sys. Fed'n No. 91, Ry. Emps.' Dep't v. Wright*, 364 U.S. 642, 651 (1961))). Thus, the judicial character of the district court's consent decree must not be overlooked, even if the underlying issue involves a matter of the consent decree's interpretation.

---

[1]This court has described the nature of the bargain underlying a consent decree as follows: "The defendant has given up the possibility of prevailing on the merits in exchange for granting certain limited affirmative relief to plaintiffs" and the "[p]laintiffs have exchanged their right to obtain adjudicatory relief." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983).

II.

Following the district court's entry of the consent decree, parties may sometimes dispute the nature of their obligations under the consent decree. Should the dispute require interpreting a consent decree's language, the Supreme Court has provided lower courts with interpretive rules to guide their analysis of that language. *See Blue Chip Stamps v. Manor Drugs Stores*, 421 U.S. 723, 750 (1975); *ITT Cont'l Baking Co.*, 420 U.S. at 236; *Armour*, 402 U.S. at 682. As explained below, the reasoning of this Supreme Court precedent strongly points towards application of federal law to interpret questions concerning federal consent decrees.

A.

Per the Supreme Court's instruction, we are to interpret the text of the document and nothing further: "[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." *Armour*, 402 U.S. at 682; *accord ITT Cont'l Baking Co.*, 420 U.S. at 236 n.10.

In fashioning this interpretative rule, the Court holds that lower courts must be interpreted with the following understanding of consent decrees in mind:

> Consent decrees are entered into by parties to the case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the ligation. Thus the decree itself cannot be said to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.

*Armour*, 402 U.S. at 681–82.

Therefore, it is the actual text of the consent decree, not what one party argues is its purpose after the fact, that governs. *Id.* And that text, the Supreme Court has stated, is to be interpreted employing certain "aids to construction" used in contract law. *ITT Cont'l Baking Co.*, 420 U.S. at 238. "Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree." *Id.* Also, any construction of the consent decree, including any proposed modification of the consent, must be supported by the text of the instrument. *See United States v. Atl. Ref. Co.*, 360 U.S. 19, 23 (1959); *Hughes v. United States*, 342 U.S. 353, 357 (1952).

Lastly—and this is a point particularly important to this case—there is "well-settled line of authority from [the] Court establish[ing] that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to be benefited by it." *Blue Chip Stamps*, 421 U.S. at 750 (citing *Armour*, 402 U.S. at 673; *Buckeye Coal & Ry. Co. v. Hocking Valley Ry. Co.*, 269 U.S. 42 (1925)). The corollary to this rule of federal law is that a federal consent decree may only be enforced by the parties who are explicitly identified or described in the decree. *Cf. id.*; *see also Armour*, 402 U.S. at 673.

B.

The above-stated rules of federal consent-decree interpretation have been stated by the Supreme Court as principles of federal common law.[2] The Supreme Court's directive in this regard is wholly consistent with, if not compelled by, our nation's constitutional structure. This is because interpreting federal judgments is a matter beyond the State legislatures' competence and is a matter incidental to the judiciary's core constitutional function as set forth in Article III of the Constitution: to issue judgments in all cases and controversies in matters within its limited subject-matter jurisdiction.

---

[2]By "federal common law," I refer to "federal rules of decision whose content cannot be traced directly by traditional methods of interpretation to federal statutory or constitutional commands," *Hart & Wechsler's: The Federal Courts and the Federal System* 635 (Richard H. Fallon, Jr., et al., 7th ed. 2015), which has the force and effect of positive federal law. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988); *see also Atherton v. FDIC*, 519 U.S. 213, 218 (1997).

As the Supreme Court made clear in *Erie Railroad Co. v. Tompkins*, "[t]here is no federal general common law."   304 U.S. 64, 78 (1938).   Nonetheless, the Court has recognized "enclaves of federal judge-made law which bind the States." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426 (1964).  As the Court explained, "federal common law exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases." *Tex. Indus. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) (footnotes omitted).

Admittedly, the boundaries of federal common law enclaves are sometimes less than clear.  The Court has instructed that federal common law applies to a dispute involving "uniquely federal interests," between two private parties because "the interests of the United States will be directly affected." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 507 (1988).  When an area of law presents a uniquely federal interest, the creation of federal common law is "limited to situations where there is a 'significant conflict between some federal policy or interest and the use of state law.'" *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 88 (1994) (quoting *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68 (1966)); *see also Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 98 (1991) (holding that there is a presumption to apply state law "in areas in which private parties have entered legal relationships with the expectation that their rights and obligations would be governed by state-law standards").

The Court's heeding to limit the application of "judge-made" federal rules derives from the constitutional concerns raised in *Erie*.  *See* Bradford R. Clark, *Federal Common Law: A Structural Reinterpretation*, 144 U. Pa. L. Rev. 1245, 1265 (1996).  *Erie's* holding rests on two fundamental constitutional principles: federalism and separation of powers.  *See Lindenberg v. Jackson Nat'l Life Ins. Co.*, 919 F.3d 992, 996 n.4 (6th Cir. 2019) (Bush, J., dissenting from the denial of rehearing en banc).  As a matter of federalism, federal courts "unconstitutionally invade 'the autonomy and independence of the States' whenever they unilaterally apply a rule of their own choosing in lieu of substantive state law—that is, in the absence of a controlling federal constitutional, statutory, or treaty provision requiring application of that rule."  Clark, *supra*, at 1259 (quoting *Erie*, 304 U.S. at 78).  And as for the second constitutional principle presented in

*Erie*, the "[o]pen-ended federal common lawmaking by courts enables the judiciary to evade the safeguards inherent in" the Constitution's procedural scheme for fashioning positive federal law. *Id.* at 1269; *Nw. Airlines, Inc. v. Transp. Workers Union of Am. AFL-CIO*, 451 U.S. 77, 95 (1981) ("[F]ederal courts, unlike their state counterparts, are courts of limited jurisdiction that have not been vested with open-ended lawmaking powers.").

Assuming an area of law warrants a uniform federal law, these above-mentioned constitutional concerns are addressed if "the rule in question . . . concern[s] matters that fall beyond the legislative competence of the states" and must "be necessary to further some aspect of the constitutional scheme." Clark, *supra*, at 1271; *see generally id.* at 1271–75. The first step is rather intuitive: any rule fashioned by a federal authority involving a matter beyond the legislative competence of the States does not offend the federalism concerns expressed in *Erie*. *Id.* at 1274. And the second inquiry asks, "whether judicial application of the rule in question constitutes either the application of rules implied directly from the constitutional structure, or adherence to customary rules of decision necessary to implement a basic feature of the constitutional scheme." *Id.*

The power of Article III courts to issue judgments and issue their interpretation of other federal courts' judgments is without question a matter involving unique federal interests. *See Atherton v. FDIC*, 519 U.S. 213, 218–19 (1997); *cf. Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). Moreover, the interpretation of a federal court's consent decree is a matter beyond the State legislatures' competence. *Cf. Fortin v. Comm'r of Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 798 (1st Cir. 1982) (explaining that "[t]here is no state court to which the question of interpreting the decree could be certified or to whose authority and expertise the federal court could defer by abstaining").

A fundamental aspect of our system of government is the federal judicial department established under Article III with its power to decide cases and controversies. Importantly, at the irreducible core of Article III authority, is the power to enter final judgments. *See Gordon v. United States*, 117 U.S. 697, 702 (decided 1864, Opinion printed in Appendix 1885); *see also Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 816 (1987) (Scalia, J., concurring in the judgment) (observing that the role of a federal judge is "to decide, in

accordance with law, who should prevail in a case or controversy"). This constitutional power and core function leave no room for state law to interpret the judgments entered by federal courts.

"Article III of the Constitution establishes an independent Judiciary, a Third Branch of Government with the 'province and duty . . . to say what the law is' in particular cases and controversies." *Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1322 (2016) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). Incident to that power, Congress "may not usurp a court's power to interpret and apply the law to the circumstances before it." *Id.* (cleaned up); *accord City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). States lack the power to usurp a federal court's Article III power as well. *Cf. Hanna v. Plumer*, 380 U.S. 460, 472–73 (1965); *Sibbach v. Wilson & Co.*, 312 U.S. 1, 13–14 (1941). "[T]he Framers crafted this charter of the judicial department with an expressed understanding that it gives the Federal Judiciary the power, not merely to rule on cases, but to *decide* them, subject to review only by superior courts in the Article III hierarchy." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218–19 (1995). Given that the federal judiciary department's inherent function is to issue final judgments, it follows that federal judges have the power to interpret their judgments using the law of the jurisdiction from which they derive their power. This federal judicial power includes the authority to determine who or what is bound to the court's judgments.[3] *Cf.* Restatement (second) of Judgments § 87 cmt. a ("The source of the federal courts' authority is in Articles I and III of the Constitution. It is therefore appropriate to hold that, at least in the absence of some other provision by Congress, the effects of a federal judgment are a legal implication of those provisions.").

Applying state law to the interpretation of federal consent decrees sharply conflicts with this Article III power of a federal court over its judgments. *Cf. Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 436 (6th Cir. 2009). The unflinching and mechanical use of state law to interpret consent decrees results in the quintessential act of a federal government

---

[3]This inherent function is analogous to the federal judiciary's "inherent power, governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962) (internal quotation marks omitted); *see also In re Univ. of Mich.*, 936 F.3d 460 (6th Cir. 2019).

department—a federal court's final judgment—being governed by the vagaries of the law of a different jurisdiction altogether, namely, that of a state government.[4] In contrast, application of federal law ensures that this chief function of a federal court is governed by the law of the jurisdiction from which that court derives its authority.

Moreover, applying federal common law to this area is consistent with the Supreme Court's conclusion in *Semtek*, which was that the *effect* of a federal court's judgment in subsequent cases is a matter for the courts "to determine the appropriate federal rule." 531 U.S. at 508. Indeed, as a matter of equity, it would only be appropriate for a consent judgment that draws upon the court's equitable powers, to be governed by the federal common law. *See Burrill v. Locomobile Co.*, 258 U.S. 34, 38 (1922) (recognizing that "the laws of the States are the rules of decision" in common law actions, but the court's equity "follows its own rules"); *see also Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 105 (1945); Restatement (second) of Judgments § 87 cmt. a ("The few cases in which the federal adjudication was a decree in equity, as distinct from a judgment at law, elicited no special notice of the problem of governing law.").

Although consent decree interpretation should be a matter of federal common law, that does not mean that state law cannot inform the appropriate rule. Given that the States predominate in matters relating to contract law, it would be natural to resort to their principles of contract law should a need arise for a new interpretive rule. *Cf. John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 548 (1964) ("State law may be utilized so far as it is of aid in the development of correct principles of their application in a particular case, but the law which ultimately results is federal." (citations omitted)); *Semtek*, 531 U.S. at 508 ("This is . . . a classic case for adopting, as the federal prescribed rule of decision, the law that would be applied by state courts in the State in which the federal diversity court sits."). But, reliance on state

---

[4]For an illustrative, historic example of the negative implications that could stem from the "mechanical application" of state law in an area where federal common law would be more appropriate, *see Hanna v. Plumer*, 380 U.S. 460, 472–73 (1965) ("One of the shaping purposes of the Federal Rules is to bring about uniformity in the federal courts by getting away from local rules. This is especially true of matters which relate to the administration of legal proceedings, an area in which federal courts have traditionally exerted strong inherent power, completely aside from the powers Congress expressly conferred in the Rules. The purpose of the Erie doctrine . . . was never to bottle up federal courts with 'outcome-determinative' and 'integral-relations' stoppers—when there are 'affirmative countervailing (federal) considerations' and where there is a Congressional mandate . . . supported by constitutional authority.'" (citation omitted)).

common law for guidance in fashioning the federal common law of consent decrees should not be mistaken for an abdication of federal law as the governing law for the interpretation of a federal court's consent decree.

## III.

### A.

In recognizing consent decree interpretation rules, the Supreme Court has never instructed the lower federal courts to apply state law. Rather, as explained above, the Supreme Court impliedly reserved federal common law for the interpretation of district court consent decrees. *See supra*, Part II.A. The Sixth Circuit's precedent reflected this understanding by resorting to general principles of federal law to interpret consent decrees until this court's decision in *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367 (6th Cir. 1998). At no point prior to the *Sault Ste. Marie* decision did our circuit rely on the underlying state law to supply the rule of decision to interpret a federal consent decree. Instead, we cited to United States Supreme Court decisions applying federal law. *See, e.g.*, *Huguley v. Gen. Motors Corp.*, 67 F.3d 129, 134–35 (6th Cir. 1995); *United States v. Louisville & Jefferson Cty. Metro. Sewer Dist.*, 983 F.2d 1070, 1993 WL 7516, at *3 (6th Cir. 1993) (unpublished table opinion); *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1148 (6th Cir. 1992); *Thompson v. Commonwealth of Ky. Dep't of Corr.*, 780 F.2d 1023, 1985 WL 13958, at *1 (6th Cir. 1985) (unpublished table opinion).

*Sault Ste. Marie* changed all that. After *Sault Ste. Marie*, the generalized principles of federal contract law no longer provide the rule of decision in matters relating to a federal consent decree's interpretation in our circuit. 146 F.3d at 372. At issue in *Sault Ste. Marie* was whether the Native American tribes subject to a consent decree were required to make payments to the State of Michigan under the terms of a consent decree, that required the tribes to make payments if they held the "exclusive right to operate" electronic games of chances in Michigan. *Id.* at 369. At the invitation of the parties' briefing, the *Sault Ste. Marie* court held that "[b]ecause this contract was formed in the State of Michigan, it is interpreted under Michigan law." *Id.* at 372. The *Sault St. Marie* court did not follow the Court's interpretative guidelines set forth in *Armour*

and *ITT Continental Baking Co.* and offered no explanation for ignoring the applicable Supreme Court precedent.

Given the *Sault Ste. Marie* court's observation that "[c]onsent decrees and judgments are binding contracts," the court concluded that state law should govern the interpretation of a federal consent judgment because state law is used to interpret contracts. 146 F.3d at 372 (citation omitted). The court therefore resorted to principles of Michigan contract law to determine whether the district court erred in concluding that the consent decree was unambiguous and did not need to consider extrinsic evidence to interpret the ambiguous wording in the consent decree. *See id.* at 373–74.

Based on this precedent, this court must now resort to state contract law to interpret federal consent decrees. *See e.g.*, *John B.*, 710 F.3d at 407; *G.G. Marck & Assocs., Inc. v. Peng*, 309 F. App'x 928, 934 (6th Cir. 2009) ("A consent judgment is treated as a contract formed and interpreted under the law of the state in which it was formed." (citation omitted)); *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 169 F. App'x 976, 988–89 (6th Cir. 2006).[5] However, neither *Sault Ste.* Marie, nor subsequent cases applying that decision, have ever addressed the tension between application of state law to federal consent decree interpretation and the Supreme Court's reasoning in *Armour* and *ITT Continental Baking Co.* Given this court's abrupt departure from the Supreme Court's interpretative rules for consent decrees, and this court's inconsistent approach post-*Sault Ste. Marie*, I question whether *Sault Ste. Marie* was rightly decided.[6] I respectfully submit that the better course for our court would be to return to the reasoning offered by this court's decisions pre-*Sault Ste. Marie*. In doing so, we would reconcile our precedent with the Supreme Court's approach to interpreting federal consent decrees, and we would discontinue applying state law within an area it should not govern.

---

[5]I would also note that at least in one instance, this court has not applied state law to interpret the underlying consent decree as *Sault Ste. Marie* requires. *See Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 477–81 (6th Cir. 2007).

[6]I do not question whether the *Sault Ste. Marie* court interpreted the consent decree in the underlying case correctly. I only question its underlying conclusion that state law governs the interpretation of consent decrees.

B.

I would also note that our court's attention to this issue is warranted because there is a divide among the majority of our sister circuits. *Compare Doe v. Pataki*, 481 F.3d 69, 76–77 (2d Cir. 2007) (no resort to state law); *Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 958–59 (8th Cir. 2002) (same); *Sierra Club v. Meiburg*, 296 F.3d 1021, 1029–32 (11th Cir. 2002) (same); *United States v. W. Elec. Co.*, 12 F.3d 225, 230–31 (D.C. Cir. 1993) (same); *Fortin*, 692 F.2d at 798–99 (same);[7] *Fox v. U.S. Dep't of Hous. & Urban Dev.*, 680 F.2d 315, 319–20 (3d Cir. 1982) (same), *with Frew v. Janek*, 780 F.3d 320, 327–28 n.28 (5th Cir. 2015)[8] (applying state contract law to resolve consent decree interpretation); *Collins v. Thompson*, 8 F.3d 657, 659 (9th Cir. 1993) (same); *Sinclair Oil Corp. v. Scherer*, 7 F.3d 191, 194 (10th Cir. 1993) (same); *United States v. City of Northlake*, 942 F.2d 1164, 1167 (7th Cir. 1991) (same).

Those circuits that apply state law to resolve an interpretative issue relating to consent decrees have reasoned, like our court in *Sault Ste. Marie*, that state law applies because a "judicially approved consent decree, like a settlement agreement, is essentially a contract for purposes of construction." *City of Northlake*, 942 F.2d at 1167 (citation omitted); *see also Frew*, 780 F.3d at 328 n.28. While that proposition might be true at its most basic level, these circuits have not satisfactorily explained why state law supplies the rule of decision for a quintessential act of the federal government—an Article III court's final judgment—especially considering the

---

[7]It is important to highlight one aspect of the First Circuit's reasoning in *Fortin*. There, the appellant argued that the district court erred in failing to certify a question to the Massachusetts Supreme Court to address whether the district court's remedy was appropriate under the consent decree in light of state law. 692 F.2d at 798. The First Circuit rejected the appellant's argument, reasoning that "[i]t makes no difference if state law was unclear, because the court was interpreting the consent decree, not the underlying law," and "[t]here is no state court to which the question of interpreting the decree could be certified or to whose authority and expertise the federal court could defer by abstaining." *Id.* In other words, state law did not supply a rule of decision regarding the district court's interpretation of its own consent decree. Considering this observation, it follows that the federal law of interpretation, using the interpretive principles established by the Supreme Court, should apply.

[8]The Fifth Circuit has only recently joined those circuits that apply state law to interpret consent decrees. Prior to its decision in *Frew*, there is no indication that the Fifth Circuit relied upon state-law contract principles to interpret consent decrees. *See, e.g.*, *Dean v. City of Shreveport*, 438 F.3d 448, 460–61 (5th Cir. 2006); *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998); *N. Shore Labs. Corp. v. Cohen*, 721 F.2d 514, 519–20 (5th Cir. 1983), *overruled on other grounds as recognized by Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 549 n.17 (5th Cir. 1998).

Supreme Court's interpretation rules in *Armour* and *ITT Continental Baking Co.* that seem to favor applying federal law in these circumstances. *See supra*, Part II.A.

IV.

If this court were to apply federal law to interpret the consent decree in this case, the outcome would likely be different. Based upon the four corners of the consent decree before us, it does not appear that the parties intended for U.S. Filter/JWI Inc.'s successors-in-interest and assigns to enforce the consent decree.

Under Michigan contract law, a third-party beneficiary may sue under a breach-of-contract theory "when the promisor undertakes an obligation 'directly' to or for the person." *Koenig v. City of South Haven*, 597 N.W.2d 99, 104 (Mich. 1999); *accord Kammer Asphalt Paving Co. v. E. China Twp. Schs.*, 504 N.W.2d 635, 642 (Mich. 1993); *see also Ragnone v. Charter Twp. of Fenton*, No. 267530, 2006 WL 3103043, at *2 (Mich. Ct. App. Nov. 2, 2006) (per curiam) (applying contract law's third-party beneficiary doctrine to consent decrees issued by Michigan trial courts). In essence, Michigan contract law authorizes third parties (i.e., those lacking privity in contract), in limited circumstances, to enforce a contract between the original bargaining parties (or their assignees), even if those beneficiaries are not explicitly referenced in the contract (or, in the present case, the consent decree). In the context of federal consent decrees, however, the Supreme Court, as noted, does not permit this. *See Blue Chip Stamps*, 421 U.S. at 750 ("[A] consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it even though they were intended to benefit by it."); *accord Vogel v. City of Cincinnati*, 959 F.2d 594, 598 (6th Cir. 1992).

Given the Supreme Court's holding that the third-party beneficiary doctrine is inapplicable to federal consent decrees, and the contrary rule that applies under Michigan contract law, a critical choice must be made: does the Supreme Court's precedent in *Blue Chip Stamps* apply or does Michigan contract law apply? Because state law currently governs the interpretation of federal consent decrees in our circuit, we must defer to state law (here, Michigan's law) in matters relating to the third-party beneficiary doctrine. This means that at most, the Supreme Court's decision in *Blue Chip Stamps* is persuasive authority. But as the

Majority Opinion recognizes, the Supreme Court's decision in *Blue Chip Stamps* is *binding* authority. *See* Majority Op. at 8. As such, it is key evidence that federal district courts' interpretation of consent decrees should be governed by federal common law and that the *Blue Chip Stamps* rule—allowing enforcement of a consent decree by only a beneficiary that is expressly identified—should apply here. *See* 421 U.S. at 750.

There also is a conflict between Michigan law and federal law regarding assignment of contracts. Under Michigan law, contracts are freely assignable unless clearly restricted by the language of the instrument. *See Jawad A. Shah, M.D., PC v. State Farm Mut. Auto. Ins. Co.*, 920 N.W.2d 148, 158 (Mich. Ct. App. 2018). Under federal law, consent decrees are not. *See Blue Chip Stamps*, 421 U.S. at 750; *Armour*, 402 U.S. at 673. Similar to Michigan's third-party beneficiary doctrine, Michigan's doctrine of assignability requires courts to construe the parties' agreement beyond the four corners of the consent. As I explain above, the Supreme Court's interpretative rules do not permit this. *See supra*, Part II.A.

Both parties contemplated that M.W. Watermark LLC & Michael Gethin as well as their successors-in-interest and assigns would be bound by the consent decree: the consent decree permanently enjoined "M.W. Watermark LLC, and Michael Gethin and its, his or their principals, agents, servants, employees, attorneys, successors and assigns" from using U.S. Filter/JWI's trademarks and other proprietary information. R. 1-7, PageID 358. However, there is no such language regarding successors-in-interest and assigns regarding the enforcement rights of U.S. Filter/JWI. Applying the federal common law rule of *Blue Chip Stamps*, the absence of such language regarding U.S. Filter/JWI suggests that the parties did not intend for any successors-in-interest or assigns of U.S. Filter/JWI, such as Evoqua, to enforce the consent decree. This is because the question of "who" is subject to the consent decree is a term that is expressly contemplated by the parties. *See Armour*, 402 U.S. at 680 (noting that a "successors and assigns' clause" would have aided the government's argument that the company's successors and assigns were bound by the consent decree); *see also Thatcher v. Kohl's Dep't Stores, Inc.*, 397 F.3d 1370, 1375 (Fed. Cir. 2005) (holding that the absence of successors-in-interest or assigns clause "is the functional equivalent of the parties' express intent to exclude language of

assignment" and "[e]qually as telling is that the consent judgment specifies successors and assigns when listing" the defendant's obligations).

Equally, the language used to describe M.W. Watermark LLC and Mark Gethin's obligations under the decree, further support the conclusion that, if federal common law applies, the consent decree does not apply to U.S. Filter/JWI's successors-in-interests or assigns. For example, the decree states: "Defendants are ENJOINED, permanently, from using Plaintiff U.S. Filter/JWI, Inc.'s ('USF/JWI's') trademarks . . . and colorable imitations thereof and any other designs, designations or indicia in a manner that is likely to cause confusion, mistake or deception with respect to USF/JWI's trademark rights." R. 1-7. Even Evoqua concedes in its reply brief: "The clear intention of the parties, evidenced by the fact that the consent decree was characterized by the parties and the court as a Permanent Injunction, was to permanently and forever enjoin Watermark from misusing the proprietary information, and infringing the trademarks, *of Evoqua's predecessor*." Third Br. at 16 (emphasis added). In other words, the obligations of M.W. Watermark, LLC and Mark Gethin are owed to U.S. Filter/JWI and not to Evoqua.[9]

This reading of the consent decree—to limit the power of its enforcement to only the entities that obtained and are explicitly identified or described in the decree—is not a far-fetched reading in light of practical business considerations. M.W. Watermark LLC and Michael Gethin may have agreed to the consent decree, in part, because they wanted it worded to ensure that only the present parties against which they were litigating, U.S. Filter/JWI, had the power of decree enforcement. As a practical, *ex ante* matter, there is a significant transactional reason for a party subject to a consent decree to limit the scope of persons or entities that may enforce it. As rightly observed by the district court:

---

[9]As indicated by the Majority Opinion, U.S. Filter/JWI has a long history of corporate mergers. *See* Majority Op. at 2. For purposes of my analysis, I assume that the obligations of M.W. Watermark LLC and Mark Gethin to U.S. Filter/JWI continue to its successors who originate by operation of a corporate merger: here, Siemens Water Technologies Holding Corporation and Siemens Industry, Inc. Because Siemens Industry, Inc. sold its water technologies business to Siemens Water Technologies LLC and Siemens Water Technologies was not a product corporate merger, I do not consider the obligations of M.W. Watermark LLC and Mark Gethin under the consent to decree to pass on to Siemens Water Technologies LLC.

> The party restrained by the injunction would likely be more inclined to impose limits on who can enforce the injunction, and might try to negotiate a judgment that limited enforcement to the original plaintiff. After all, a restrained party has no control over who the original party selects as an assignee, and the restrained party may be substantially more burdened by enforcement by an assignee than by the original plaintiff.

R. 154, PageID 6979 n.7.

Therefore, for the purpose of avoiding the chilling of future parties' willingness to enter into transactions at the front-end, and in light of the importance of strongly favoring the settlement of disputes with limited, or without, litigation at the back end, *see Ford Motor Co. v. Mustangs Unlimited, Inc.*, 487 F.3d 465, 469 (6th Cir. 2007), we should honor any parties' bargain that sets a limit to the entities subject to the consent decree.

On the other hand, if there is a possibility that parties remain uncertain as to the precise scope of the consent decree because of the underlying state contract law, as our current doctrine compels, there is a risk that parties may avoid settlement activities out of fear that unknown parties could arise out of the woodwork later to make claims under the consent decree. A certain way to avoid this risk, and to promote uniformity in this area, would be through a consistently applied federal rule. The consistent use of a federal rule of decision to interpret consent decrees issued by federal courts would be the most pragmatic means in which to avoid this risk, and to promote uniformity in this field of law. Thus, according to the Supreme Court's interpretative rules, we must look to the parties' express language as used in the consent decree at issue to settle the underlying controversy here: whether U.S. Filter/JWI's successors-in-interest or assignees may enforce this consent decree. This language seems to preclude enforcement by such successors-in-interest and assigns because language giving them the right of enforcement was not included in the consent decree.

Therefore, applying federal common law, the agreement would not be read to tether the defendants' obligations to the specific intellectual property regardless of who owns it. Instead, the agreement, as written, reflects the parties' intent to bind the defendants to the intellectual property at issue when it is owned by U.S. Filter/JWI. To hold otherwise, would depart from the parties' intended arrangement. *See Huguley*, 67 F.3d at 133 ("A consent decree is a contractual

agreement and, if the parties have agreed not to impose [enforcement by successors-in-interest or assigns], the district court is not free to reform the contract to compensate one party for making a bad bargain.").

But, because we are bound by *Sault Ste. Marie* to apply state law to the consent decree interpretation issues here, I agree with the Majority that Evoqua, as a successor-in-interest or an assign of U.S. Filter/JWI, may enforce the consent decree, despite that there is no express language in the decree giving Evoqua this right.

V.

This is a case whose outcome in part hinges on whether state law or federal law applies. And although I would have applied federal law to resolve it, as that is the appropriate source of law to supply the rule of decision for this case, our precedent requires us to apply state contract law. Thus, I respectfully concur and further note that it may be prudent for the full court to revisit this issue.